Margaret M. CONWAY, Plaintiff,

v.

BOSTON EDISON
COMPANY, Defendant.

Civ. A. No. 87–3093–S.

United States District Court,
D. Massachusetts.

Jan. 25, 1990.

four state-law claims. Those claims, like Plain-   tiffs' state-law claims, will be dismissed.

Harold L. Lichten, Angoff, Goldman, Manning, Pyle, Wanger & Hiatt, Boston, Mass., for plaintiff.

Robert P. Morris, Keith B. Muntyan, Morgan, Brown & Joy, Boston, Mass., for defendant.

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

SKINNER, District Judge.

Plaintiff filed a complaint in the Superior Court, Suffolk County, Massachusetts, alleging discrimination on the basis of handicap, under Mass. Const. amend. art. CXIV and Mass. Gen. L. ch. 12, §§ 11H and 11*I*. Plaintiff later amended her complaint to plead, in addition, discrimination in employment under Mass. Gen. L. ch. 151B, §§ 4(16) and 9. The amended complaint also alleges a violation of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001 *et seq.*, and, in the alternative, common law breach of contract. Noting the federal question presented by the ERISA claim, defendant removed the case to this court. It is before me on defendant's motion for summary judgment. For reasons stated below, the motion is allowed.

### FACTS

Based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits in this case, and resolving all doubts and making every reasonable inference in favor of plaintiff, I find that the facts could be as follows.

Plaintiff has scoliosis, a lateral curvature of the spine which in some cases causes disabling pain. Since 1974, she had been employed by defendant, rising to the position of secretary at clerical grade 8. She was well regarded, except that in her last several years her back condition got worse and occasionally caused her to miss work.

She began an indefinite medical leave of absence in December 1983. She received sick leave and full salary-continuation benefits until they expired in May 1984. At that time, she was placed on the "inactive payroll." After six months of absence, plaintiff qualified for long term disability insurance benefits.

*1985 Events*

During plaintiff's sixteen-and-one-half months of leave, her disability was monitored by defendant's medical department. At first, plaintiff told the department that her pain, especially while sitting, made it impossible for her to work. In early 1985, plaintiff thought she could return to work. On February 25, her personal physician, an orthopedic surgeon, examined her and reported: "She seems to gradually be well.... I think that she can return to work if it is appropriate to her circumstances and if she can tolerate it." Later that day, a company doctor saw plaintiff and concluded that she could not tolerate 6–8 hours of sitting a day.

In April 1985, a company physician interviewed plaintiff. Plaintiff told him she was in severe pain, and he concluded that she was unable to return to work. At her deposition, plaintiff testified that her pain was caused by unusual, aggravating activity that day. However, there is no evidence that she told that to the examining physician. The doctor explained to plaintiff that when she returned to work her disability benefits would cease; he warned her that if she returned prematurely and pain forced her to quit, disability benefits would not resume until the policy's six month waiting period had elapsed. The doctor conducted himself in a professional manner. Although he actively discouraged her from returning to work, he did not threaten her. Despite the doctor's evaluation, plaintiff continued to feel that she could return to work.

After the company doctors had reported, defendant declined to reinstate plaintiff in active employment. Plaintiff's supervisor, agreeing with the doctors, thought that plaintiff would suffer incapacitating pain without the daily regimen of exercise she practiced during her period of disability. In his report for her personnel file, plaintiff's supervisor recommended that she not be rehired because of her "attendance problem." He wrote: "Margaret's degenerating condition was increasingly affecting her attendance and ability to do her work."

After plaintiff had been absent 506 days and on the inactive payroll for a year, defendant, following company policy, terminated her status as an employee. She continued to receive long term disability benefits.

Plaintiff alleges that defendant's refusal to reinstate her, and her subsequent termination, were acts of unlawful discrimination based solely on handicap. She argues that defendant was improperly motivated by her attendance record and that its actions were not medically justified.

*1987 Events*

In early 1987, plaintiff again asked defendant for employment. A receptionist told her that the company had no secretarial positions to fill at that time and would not give her an application. Other hiring personnel told her the same thing. Finally, she saw the vice president for employee relations, who allowed her to complete an application. He told her that there were no secretarial positions open at that time anywhere in the company, but that if one became available she would have to take a typing test like everyone else. She argued with him about the test, explaining that she had been tested throughout her employment at the company; that, during her disability, she had received an A in typing at a secretarial school; and that having to take the test would humiliate her. On her application, she expressed an interest in a "staff assistant" or "executive secretary" position.

There is evidence that the defendant hired several secretaries in that period, although apparently not for the particular job categories that plaintiff had designated. Plaintiff's former supervisor advised her that defendant had been hiring secretaries and that if she wanted to return to Boston Edison she should get a lawyer.

Plaintiff filed a complaint against defendant with the Massachusetts Commission Against Discrimination on April 30, 1987. Her allegations concerned defendant's refusal, over the previous two months, to consider her for a position comparable to her former job. After she hired an attorney and threatened a lawsuit, plaintiff was considered for a secretarial job.

In May 1987, plaintiff failed the typing test four times. That particular test was required of all applicants for secretarial positions, including former employees who had not yet taken it. Plaintiff's lawyer admitted in a letter to defendant that plaintiff was "rusty" at typing; but plaintiff also avers that she was upset at being forced to demonstrate her skills despite years of commendable service to the company: the pressure of a timed test, under these circumstances, aggravated her back problem, and the pain impaired her concentration. After her first failure, however, she told defendant's testing officer only that she was nervous; she stated that nothing specific had caused her difficulty. She never mentioned back pain or asked to be exempted from the testing requirement as an accommodation to her handicap.

Although plaintiff may have been able to work in early spring, defendant's medical department did not clear her for employment until July 7, 1987. In order to mitigate its damages in a lawsuit, defendant offered plaintiff a clerical job on August 10.

Based on her test scores, plaintiff was hired at clerical grade 2, instead of her former grade 8. The grade 2 position paid less and had poorer disability benefits. Plaintiff's former supervisor told her that the company could tolerate future absences from the grade 2 position better than from her former position; it "wouldn't matter so much" if she had to be absent from the grade 2 position. Plaintiff believed that her supervisor was speaking for himself, not the company, in an attempt to console her. He had had no control over what job she was offered.

Plaintiff worked for a temporary agency from May 1 to July 10, 1987. She returned to work for defendant, in the grade 2 clerical job, on August 17, 1987.

Plaintiff argues that defendant initially refused to take her application and later hired her at grade 2 because of her handicap. She argues that the typing test, in her case, had an unjustified disparate impact; furthermore, defendant failed to make reasonable accommodation for her disability by waiving the test.

*Long–Term Disability Plan*

Defendant maintained a long-term disability program for its employees. Plaintiff alleges that the program provided for rehabilitative employment of injured employees, with insurance to pay any difference in compensation between the two jobs. Plaintiff argues that defendant breached this contract and violated ERISA by not giving her a rehabilitative position in 1985 and by not paying the salary difference between grades 2 and 8 in 1987. (She maintains that the grade 2 job she got was rehabilitative employment under the program.)

There is no evidence of such a program other than plaintiff's testimony and a reference in the company's long-term disability insurance policy. Plaintiff's understanding was that if a disability caused a beneficiary returning to work to take a lower-paying job, then that job would qualify as rehabilitative employment under the program. Yet plaintiff testified that the job she took in August 1987 was in no way better for her back than her old job, and in fact required more sitting.

The insurance policy states that disability benefits will generally be reduced by any income earned by the beneficiary through employment. An exception is made for "approved rehabilitation employment," whereby:

if such income is received by reason of earnings from employment, with [the employee's] Employer or any other employer, or from his self-employment, under a plan of approved rehabilitation employment (as hereinafter defined) only 60% of such earnings shall be applied to reduce benefits hereunder....

.    .    .    .    .

As used herein the term "approved rehabilitation employment" means any employment, including self-employment, in which the employee participates, after becoming totally disabled, and which both the Employer and Insurer approve for the employee as being reasonably conducive to his return to active work in a gainful occupation, business or employment. Participation by the employee in rehabilitation employment while it is approved for him by the Employer and Insurer shall not terminate his period of disability or any existing entitlement to benefits under this coverage.

According to defendant's affidavits, the policy does not require defendant to provide employees on disability leave with rehabilitative employment. Plaintiff never used the procedure for claiming benefits under defendant's employee benefit plans to request a rehabilitative job. The job plaintiff took in August 1987 was not "approved rehabilitation employment."

## DISCUSSION AND RULINGS OF LAW

■ Summary judgment "is a useful device for ... putting a swift end to meritless litigation." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The standard of decision is well established. *See Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 105 (1st Cir.1988) (race discrimination in employment). Defendant must affirmatively demonstrate the absence of a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). If the motion is supported by the record, plaintiff "may not rest upon the mere allegations of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Id.*, quoting *First Nat. Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). An issue is "genuine" if a reasonable jury could return a verdict for plaintiff on the evidence presented. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. Insignificant or merely colorable evi-

dence is insufficient. *Id.* at 249–50, 106 S.Ct. at 2510–11; *De Arteaga v. Pall Ultrafine Filtration Corp.*, 862 F.2d 940 (1st Cir.1988) (age discrimination in employment). "Material" facts are those that might affect the outcome of the litigation under the applicable substantive law. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552.

### Counts III and IV. ERISA and Contract Claims

■ The insurance policy does not evidence a contractual undertaking by defendant to provide a disabled worker with rehabilitation employment. It merely preserves certain insurance benefits that a beneficiary would otherwise lose when she returns to work, as long as she is working under an approved rehabilitation program. This provision allows disabled persons to keep some of their gains from work and thereby encourages rehabilitation. But the insurance policy imposes no obligation on defendant to offer any kind of employment to beneficiaries. Plaintiff has produced no other evidence of the rehabilitation plan that she claims defendant maintains for her benefit. I must conclude that defendant was not obligated to offer plaintiff rehabilitation employment under ERISA or by any contract.

■ Plaintiff also maintains that the benefit plan required defendant to pay the difference between compensation at grade 2 and grade 8, on the ground that the grade 2 position she took in August 1987 was rehabilitative employment. This is not true. Even if the grade 2 job had been approved as rehabilitation employment for plaintiff, no one was required to pay the difference between the two levels of compensation. What the plan provides is that 60% of her grade 2 compensation would have been applied to reduce her insurance benefits. In fact, plaintiff's grade 2 employment did not qualify as "approved re-

habilitation employment" under the plan. Plaintiff never sought approval. Moreover, plaintiff's own testimony suggests that approval would not have been given, since the clerical work at grade 2 was not rehabilitative but was actually worse for plaintiff's back.

Because plaintiff cannot establish the contractual obligations essential to her claims, defendant is entitled to summary judgment on Counts III and IV.

### Jurisdiction over State Claims

■ I am authorized by 29 U.S.C. § 1441(c) to entertain the remaining claims in this action or, in my discretion, to remand them. Neither party has addressed the question of remand, although it should have been clear early on that the ERISA claim would not survive. Instead, both parties seem eager to have me decide the whole motion.

There is no need to remand issues that I can readily decide without offense to principles of comity and federalism. This case is ripe for summary judgment. A remand would delay its disposition. In the interest of overall economy I will decide the remainder of the motion.

### Count I. Constitutional and Civil Rights Act Claims

#### Mass. Const. amend. art. CXIV

The parties have devoted considerable argument to whether plaintiff may prosecute a claim arising directly under amend. art. CXIV. That amendment, approved on November 4, 1980, provides:

> No otherwise qualified handicapped individual shall, solely by reason of his handicap, be excluded from the participation in, denied the benefits of, or be subject to discrimination under any program or activity within the commonwealth.

Defendant contends, first, that a direct cause of action under the amendment is precluded by the existence of a procedurally adequate remedy in the Massachusetts Civil Rights Act (MCRA), Mass. Gen. L. ch. 12, §§ 11H and 11I, enacted in 1979. *Grubba v. Bay State Abrasives, Div. of Dresser Indus., Inc.*, 803 F.2d 746 (1st Cir. 1986); *Marsman v. Western Elec. Co.*, 719 F.Supp. 1128, 1142 (D.Mass.1988). The right to relief under MCRA is limited to cases of actual or attempted interference with the exercise or enjoyment of civil rights "by threats, intimidation or coercion." Plaintiff would limit *Grubba* to cases where coercion has been established; she argues that if I rule that there is no genuine issue of coercion in this case, *Grubba* does not control and I should allow her to proceed with a claim for noncoercive deprivation of rights under amend. art. CXIV. I do not read *Grubba* so narrowly. *Grubba* was decided on the pleadings. The existence of an independent right of action under the constitution should not depend on whether the plaintiff pleads, or might plausibly plead, coercion. In any event, *Grubba* cannot be distinguished from this case, because plaintiff has pleaded coercion.

A recent decision of the Supreme Judicial Court, however, casts serious doubt on *Grubba.* In *Layne v. Superintendent, Mass. Correctional Inst., Cedar Junction,* 406 Mass. 156, 546 N.E.2d 166 (1989), the court recognized a direct cause of action against state actors for violation of the constitutional amendment without the use of threats, intimidation, or coercion. *Layne* involved a claim for damages asserted by physically handicapped prisoners. The defendant corrections officials had moved the prison libraries down a steep flight of stairs, making them inaccessible to the plaintiffs. The Superior Court granted summary judgment to the plaintiffs on their MCRA claim. The Supreme Judicial Court reversed, finding no coercion. The court vacated the judgment and remanded the case for review of plaintiffs' implied cause of action under amend. art. CXIV. The material issues were "whether [plaintiffs] were substantially prejudiced by the discrimination, whether the burden on the Commonwealth of eliminating the discrimination was too great, and whether there was an overriding State interest justifying the discrimination." *Layne*, 546 N.E.2d at 169.

The court in *Layne* noted that there has been no definitive construction of amend.

art. CXIV and limited its holding to cases of state action. It expressly refrained from considering whether the amendment applies to private persons and remarked that *Grubba* contains "little discussion of the point." *Layne*, 546 N.E.2d at 168 n. 3. *See also Cronan v. New England Tel. Co.*, 41 F.E.P. Cases 1273, 1279 (Mass.Super. 1986) (dictum) (state action may be required). As a result, it is now uncertain whether amend. art. CXIV applies to defendant at all. If it does, it is not clear whether *Grubba* should be disregarded and an alternative cause of action allowed under the constitution, as was done in *Layne* with regard to state action. Since those questions should be answered by the Massachusetts courts, I will not reach them. If that were necessary to a decision on the merits, I would remand the case instead. *See* 28 U.S.C. § 1441(c). *Cf. Naylor v. Case and McGrath, Inc.*, 585 F.2d 557 (2d Cir.1978) (abuse of discretion to decide novel issues of state law after federal claim was dismissed from case).

■ This is not the case, however, for an implied constitutional right of action, because plaintiff has a different statutory remedy which has been recognized as fully adequate. Discrimination in employment can be vindicated under the general antidiscrimination statute, Mass. Gen. L. ch. 151B.

In *Cronan*, 41 F.E.P. Cases at 1279, the Superior Court held that because ch. 151B "constitutes a comprehensive remedial statutory scheme to vindicate the rights of the handicapped in employment situations, this court will not create a new cause of action under Article 114." *Cf. Melley v. Gillette Corp.*, 397 Mass. 1004, 491 N.E.2d 252 (1986) (ch. 151B precludes common law right of action for wrongful termination based on age discrimination), *aff'g* 19 Mass. App. 511, 475 N.E.2d 1227 (1985); *Mouradian v. General Elec. Co.*, 23 Mass.App.Ct. 538, 503 N.E.2d 1318, *rev. denied*, 399 Mass. 1105, 507 N.E.2d 1056 (1987); *Sereni v. Star Sportswear Mfg. Corp.*, 24 Mass. App.Ct. 428, 509 N.E.2d 1203, *rev. denied*, 400 Mass. 1107, 513 N.E.2d 1289 (1987). I agree with the ruling in *Cronan*, which accords with general principles. Although

a limited right of action under amend. art. CXIV has since been recognized, I believe that the Supreme Judicial Court would restrict it to cases that fall outside the scope of any remedial statute. In *Layne*, the court remarked that although no statute fully implements amend. art. CXIV, where an existing remedial procedure will serve it should be followed: "If a violation of art. 114 rights can be redressed within the ambit of an existing statute, such as the State Civil Rights Act, there is a well-worn procedural path to relief for such a violation." 546 N.E.2d at 168. Chapter 151B is a well-traveled route to administrative and judicial relief from employment discrimination. In 1983, it was amended to protect handicapped individuals like plaintiff. Because ch. 151B supplies a fully adequate procedure to redress handicap discrimination by an employer, it precludes a right of action arising directly under the constitution.

### MCRA

■ Regarding plaintiff's MCRA claim, the threshold question is whether it is precluded, like the constitutional claim, by the remedy under ch. 151B. The Massachusetts Appeals Court has twice held that victims of age discrimination in employment have no right of action under MCRA but must proceed under ch. 151B. *Mouradian*, 23 Mass.App.Ct. 538, 503 N.E.2d 1318; *Sereni*, 24 Mass.App.Ct. 428, 509 N.E.2d 1203. In *Mouradian*, the court stated that although some types of wrongful discharge not redressed by ch. 151B may give rise to an action under MCRA:

> [t]his is not such a case, as the only "right[ ]" secured by the ... laws of the commonwealth" (the operative words of c. 12, § 11H, in this instance) is the right which could have been enforced under the procedures established by c. 151B. In the circumstances, G.L. c. 12, §§ 11H and 11I, do not create an independent right to vindicate an alleged wrong which might have been the subject of investigation and possible vindication under G.L. c. 151B, were it not for Mouradian's delay.

503 N.E.2d at 1321 (footnote omitted).

Although the right not to be discriminated against on the basis of handicap ar-

guably is secured by the constitution, as well as by statute, and may in general be broader than the statutory protection against age discrimination, plaintiff's claim concerns *employment.* The fundamental rationale of *Mouradian* and *Sereni* is that complaints of employment discrimination should first be submitted to the administrative agency established by the legislature to investigate them. Because handicap discrimination was intentionally included in ch. 151B, it is logical to extend the rationale of *Mouradian* and *Sereni* to this case.

Plaintiff cites *Cronan,* 41 F.E.P. Cases at 1278, which recognized an alternative cause of action for handicap discrimination in employment under MCRA. The Superior Court distinguished *Melley,* 475 N.E.2d 1227, a case that did not discuss MCRA: "the Appeals Court declined to create a *new* common law action.... *Melley* does not hold that G.L. c. 151B extinguishes other *existing* causes of action." *Cronan,* 41 F.E.P. Cases at 1278. The court did not discuss *Mouradian* or *Sereni.*

*Cronan's* rationale is that the MCRA remedy came into being in 1980, when amend. art. CXIV was ratified, and survived the 1983 amendments to ch. 151B. I do not think the Massachusetts appellate courts would go along with this creative position. First, they have never held that art. CXIV applies to private conduct. *Layne,* 546 N.E.2d at 168 and n. 3. Second, when the legislature acted in 1983, no court had recognized a cause of action for handicap discrimination under MCRA.[1] An MCRA action did not *exist* at that time in a way that distinguishes it from the inchoate common law action discussed in *Melley.* Third, regardless of the possible existence of an MCRA action from 1980 to 1983, the legislature surely intended ch. 151B to be the exclusive remedy thereafter, just as it had been for other forms of discrimination in employment. An accident of chronology should not be the basis for disrupting a uniform legislative approach to employment discrimination.

In short, the *Cronan* rationale does not measure up against the true basis of decision in the age discrimination cases. Plaintiff, aside from citing *Cronan,* offers no countervailing policy arguments. Plaintiff's failure to pursue available procedures, of course, does not warrant the creation of a right of action bypassing administrative review. Notwithstanding *Cronan,* the direction of the law in the appellate courts is fairly clear. I rule that plaintiff may not proceed under MCRA.

■ Alternatively, plaintiff has produced no evidence from which a jury could reasonably conclude that defendant's failure to rehire plaintiff resulted from "threats, intimidation or coercion." A negative employment decision in itself does not constitute coercion. *Marsman,* 719 F.Supp. at 1138; *Appling v. City of Brockton,* 649 F.Supp. 258, 261 (D.Mass.1986); *Mouradian,* 503 N.E.2d at 1321 n. 5 (dictum). *Cf. Layne,* 546 N.E.2d 166 (physical barrier to access); *Longval v. Comm'r of Correction,* 404 Mass. 325, 535 N.E.2d 588 (1989) (use of force by prison officials); *Pheasant Ridge Assocs. Ltd. Partnership v. Town of Burlington,* 399 Mass. 771, 506 N.E.2d 1152 (1987) (wrongful taking of property). In *Longval,* the court stated that "unlawful conduct ... lacks [the quality of coercion] when all it does is take someone's rights away directly." 535 N.E.2d at 593. If plaintiff's re-employment was a matter of her own choice (which is contradicted by plaintiff's statement of facts), the conversation with defendant's physician that induced her to remain on disability did not constitute threats or intimidation. Accordingly, plaintiff cannot establish a necessary element of her claim under MCRA.

### Summary

Because the complaint fails to state claims upon which relief can be granted under the constitution or MCRA, and because plaintiff cannot show "threats, intimidation or coercion" under MCRA, defendant is entitled to summary judgment on Count I.

---

1. *Grubba,* 803 F.2d 746, which held that such a right of action existed in 1982, was decided in 1984. The court did not consider the effect of ch. 151B on claims arising after 1983.

*Count II. Claims under Mass. Gen. L. ch. 151B*

Plaintiff filed a timely administrative complaint concerning defendant's conduct in early 1987. She makes no claim that defendant's 1985 acts can be remedied under ch. 151B, apparently conceding that her failure to pursue her administrative remedies in timely fashion bars such action in this court. *See Christo v. Edward G. Boyle Ins. Agency,* 402 Mass. 815, 525 N.E.2d 643 (1988). Count II therefore encompasses only the events of 1987.

█ The parties' briefs hardly address the elements and burdens of proof in a handicap discrimination action under ch. 151B. Both parties assume that the pattern developed under Title VII of the Civil Rights Act of 1964—adopted by Massachusetts courts for other types of ch. 151B litigation—applies. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), followed by *Wheelock College v. Mass. Comm'n Against Discrimination,* 371 Mass. 130, 355 N.E.2d 309, and subsequent cases. They do so notwithstanding that Mass. Const. amend. art. CXIV and the handicap amendments to Mass. Gen. L. ch. 151B were modeled on another federal law, § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and regulations promulgated thereunder. There are problems peculiar to handicap discrimination that arise from the relationship between handicap and job performance. This is reflected in the federal cases under the Rehabilitation Act. *See generally* Note, *Employment Discrimination against the Handicapped and Section 504 of the Rehabilitation Act: An Essay on Legal Evasiveness,* 97 Harv. L. Rev. 997 (1984); Note, *Accommodating the Handicapped: The Meaning of Discrimination under Section 504 of the Rehabilitation Act,* 55 N.Y.U.L. Rev. 881 (1980). In construing Massachusetts statutes, the courts will look to the interpretations of analogous federal law but are not bound thereby. *College–Town, Div. of Interco, Inc. v. Mass. Comm'n Against Discrimination,* 400 Mass. 156, 508 N.E.2d 587, 591 (1987); *Mass. Elec. Co. v. Mass.* *Comm'n Against Discrimination,* 375 Mass. 160, 375 N.E.2d 1192, 1198 (1978). The states have defined handicap discrimination in different ways. *See* Comment, *Handicapped Workers: Who Should Bear the Burden of Proving Job Qualifications?,* 38 Maine L.Rev. 135, 152–58 (1986) (discussing four judicial approaches to the "job-relatedness issue"). Since the resolution of this issue will not affect the outcome of this case, there is no need to make a definitive ruling.

*Disparate Treatment*

█ To prevail on her claim of disparate treatment at trial, plaintiff initially must show that she is an "otherwise qualified handicapped person." The statute defines this to be a handicapped person who is able to perform the essential functions of the job, or who would be if reasonable accommodation were made to her handicap. There is no question that plaintiff is "handicapped" in the statutory sense. Also, there is a genuine dispute as to her qualifications. Plaintiff's record of successful employment at grade 8 and her other qualifications suggest that she can perform the essential functions of a secretary at that level.

Under the *Wheelock College* approach, plaintiff would next have to prove that she was denied employment in favor of other applicants. That would establish a presumption of discrimination. Plaintiff sought to regain employment that was comparable to her former position at the company. She inquired about secretarial positions. She was told that the company was not hiring secretaries, but that if a position later became available she would have to take a typing test to qualify. When she was eventually allowed to file an application, she expressed an interest in "executive secretary" or "staff assistant" positions. Defendant has shown that there were in fact no job openings for the positions described. Plaintiff counters this with evidence that some secretarial positions, at comparable levels of responsibility, were filled during the period in which plaintiff was seeking employment. I cannot find, on the summary judgment record,

that plaintiff limited herself to the job titles designated on her application, even if she meant them to correspond to the narrow personnel categories used by defendant. Defendant knew that plaintiff wanted a job comparable to her old one. There is a genuine issue as to whether such a job became available for which plaintiff was denied consideration.

Accordingly, plaintiff makes out a prima facie case of discrimination. Under the traditional approach, the burden would now shift to defendant to articulate a legitimate nondiscriminatory purpose for refusing to hire plaintiff. There is undisputed evidence that defendant uniformly evaluated former secretaries, like other applicants, by their performance on a typing test; since plaintiff flunked this test, according to defendant's policy she was ineligible for positions comparable to her old job. The statute, however, states that the employer's hiring criteria must be "functionally related to the specific job or jobs for which the individual is being considered." Mass. Gen. L. ch. 151B, § 4(16). Although it is not clear who bears the burden of proof on this issue, the statute may impose a burden on the employer beyond that of articulating a legitimate nondiscriminatory purpose. If so, defendant has carried that burden. The report of plaintiff's supervisor shows that as a secretary she was required to type. It is not suggested that plaintiff sought a job that did not require typing. Plaintiff does not counter defendant's evidence that all clerical personnel above grade 2 must type. Accordingly, defendant has shown that there is no genuine dispute as to whether performance on the typing test was a legitimate hiring criterion functionally related to the jobs sought by plaintiff.

The burden shifts again to plaintiff, who at trial would now have to demonstrate that her failing the typing test was not defendant's real reason for refusing to offer her a job comparable to her old one. At this stage, plaintiff must set forth substantial evidence that defendant's test was a pretext for unlawful discrimination. *Cf. Dea v. Look*, 810 F.2d 12, 15 (1st Cir.1987) ("merely making out a prima facie case does not automatically save [plaintiff] from a summary judgment motion"). Plaintiff has produced very little evidence of pretext. At best, a jury might conclude that defendant lied to plaintiff and delayed considering her for a secretarial position. But this mistreatment was without consequence to plaintiff's employment, because no matter how soon her application might have been considered she could not have met defendant's qualification requirement for secretaries.[2] There is no evidence that defendant established the test, or required plaintiff to take it, for any improper purpose. Consequently, plaintiff's disparate treatment claim does not warrant a trial. *Cf. De Arteaga*, 862 F.2d 940 (alternative holding), in which summary judgment was granted although the burden of *persuasion* had shifted to the employer.

*Disparate Impact*

Plaintiff argues that defendant's testing requirement unlawfully discriminates against the handicapped. Apparently, defendant believes that handicapped persons in general, former secretaries returning from disability, persons with scoliosis, or some other unspecified class of qualified handicapped applicants fail the test in disproportionate numbers. This is so because the stress and humiliation of the test aggravate their physical impairments.

To support a discrimination claim based on the disparate impact of an employment test on a protected group, a plaintiff initially need only show that members of the plaintiff's class are disqualified by the test in substantially disproportionate numbers. If she makes such a showing, the burden of production shifts to the defendant, which must establish the job relatedness of the discriminatory test. *See Griggs v. Duke Power Co.*, 401 U.S. 424, 91

---

**2.** This is essentially a requirement that plaintiffs prove causation; for discriminatory treatment of no consequence to plaintiff's employment will not support a claim. *DiBenedetto v. Commonwealth*, 398 Mass. 395, 497 N.E.2d 266, 269– 70 (1986), *cert. denied*, 479 U.S. 1092, 107 S.Ct. 1305, 94 L.Ed.2d 160 (1987), citing *Kumar v. Board of Trustees, Univ. of Mass.*, 774 F.2d 1, 20 (1st Cir.1985), *cert. denied*, 475 U.S. 1097, 106 S.Ct. 1496, 89 L.Ed.2d 896 (1986).

S.Ct. 849, 28 L.Ed.2d 158 (1971); *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989).

■ Because handicap is such a variable characteristic, it is difficult to prove handicap discrimination by traditional disparate impact analysis. *See* A.J. Gittler, *Fair Employment and the Handicapped: A Legal Perspective*, 27 DePaul L. Rev. 953 (1978); Comment, 38 Maine L. Rev. at 146–48. The statutory requirement that qualification requirements be functionally related to the job appears to incorporate the *Griggs* standard of job relatedness into the individual's disparate treatment case. Often, this will obviate the statistical approach of traditional disparate impact analysis. In this case, no such analysis has been performed. Plaintiff has not even defined the affected class. Plaintiff's evidence consists of her deposition testimony that being required to take a test despite years of competent employment made her upset and nervous; that her emotional state caused her back condition to flare up; and that the atypical pain that resulted impaired her performance on the test. There is no evidence that defendant's test affects other handicapped persons in this way, however narrowly the class is defined. Plaintiff's testimony about her reaction to the typing test does not make out a prima facie case of disparate impact. *Cf. Oliver*, 846 F.2d at 110 (no evidence that employer's actions affected blacks other than plaintiff).

### Reasonable Accommodation

■ Plaintiff further argues that defendant, by requiring her to take the typing test, failed to make reasonable accommodation for her handicap. There is no substance to this claim.

"Reasonable accommodation" refers to the employer's duty to enable handicapped workers to perform their job functions. *See* Mass.Gen.L. ch. 151B, § 4(16). It stands to reason that any method used to screen applicants should provide equal accommodation or else be waived. Plaintiff has not shown that she was denied any

accommodation to which she would have been entitled on the job. Instead, she argues that waiving the typing test was the required accommodation because of the unusual stress it created.

Even if this argument were sound in theory, plaintiff's claim is not supported by the record. To withstand summary judgment, plaintiff's evidence must tend to establish (1) that defendant knew that plaintiff's handicap might vitiate the typing test as a measure of her typing ability; and (2) that defendant could have accommodated plaintiff's handicap but did not do so. Although there is scant evidence, I shall assume that defendant could have adequately evaluated plaintiff without the typing test and that this departure from defendant's normal hiring practices would not have been unduly burdensome. Nevertheless, plaintiff has failed to present a triable issue.

Defendant could not know that plaintiff might experience atypical back pain that would distort her test scores. After her first attempt at the test, plaintiff told defendant's testing officer that she was nervous; plaintiff did not tell her that her nervousness made her back flare up or that her handicap had affected her performance in any way. When asked by the testing officer if there was anything specific that caused her difficulty, plaintiff answered no. It is true that plaintiff had repeatedly objected to the testing requirement and asked that she be excused, but she did so on the basis of her employment record, not her handicap. Her lawyer later asked defendant to make allowance for plaintiff's having grown "rusty." It appears to have been at plaintiff's deposition that defendant first learned that plaintiff's scoliosis may have biased her scores.

Employers cannot be required to accommodate needs they do not know exist. This must be so, because employers risk liability for discrimination when they unilaterally decide to treat a handicapped person differently from anyone else. *See* Mass.Gen.L. ch. 151B, § 4(16) (prospective employer may not ordinarily inquire into "the nature or severity of the handicap"). Surely an

applicant with scoliosis should be *allowed* to take the typing test—say, in an effort to overcome a mediocre employment record. Because plaintiff never asked defendant to accommodate her handicap in the hiring process, defendant did not discriminate against her by refusing to waive the typing test.[3]

*Summary*

Defendant has shown that plaintiff cannot sustain an essential element of her discrimination claim under Count II upon which she bears the burden of proof at trial. Defendant is entitled to summary judgment.

Accordingly, defendant's motion for summary judgment is allowed.

---

**3.** This case differs from *Stutts v. Freeman*, 694 F.2d 666 (11th Cir.1983), where a dyslexiac was denied training to become a heavy equipment operator because of his performance on a written aptitude test. In *Stutts*, the applicant had requested alternative evaluation as an accommodation to his handicap.